UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Docket No. 3:22cr174(JAM) |
| v. | : | |
| JALANIA PANTANO | : | NOVEMBER 28, 2023 |

**GOVERNMENT'S MEMORANDUM OF LAW IN AID OF SENTENCING**

The Government respectfully submits this Sentencing Memorandum with regard to defendant Jalania Pantano (the "defendant" or "Pantano") who is scheduled to be sentenced on December 5, 2023. For the reasons detailed below, the government respectfully asks that the Court impose a sentence at the bottom of the Guidelines range (33 months under the government's guidelines calculation) as sufficient but not greater than necessary to accomplish the various goals of sentencing.

## I.    Introduction and Background

On July 7, 2022, the Middletown Police Department arrested Pantano on charges of use of drug paraphernalia, interfering with an officer/resisting, and criminal impersonation. PSR ¶ 51. On July 16, 2022, Pantano bonded out of state custody, *id*. at ¶ 50, and just four days later, on July 20, 2022, she joined her boyfriend, Gino Rizzo, to commit a bank robbery at the People's United Bank in West Hartford, Connecticut (the offense forming the basis for Count Three of the indictment). *Id*. at ¶ 18.

Federal agents arrested Pantano on August 30, 2022, and she consented to detention without prejudice. *Id*. at ¶ 5. On November 15, 2022, following a bond hearing, Pantano discharged from custody to the Perceptions House inpatient drug treatment program. *Id*. Pantano's participation in the program involved incidents of non-compliance, including failing to take her medication as prescribed on two occasions and testing positive for fentanyl and/or cocaine on three

occasions. *Id*. at ¶¶ 6-10. On March 16, 2023, the Court modified Pantano's conditions of release following her discharge from the Perceptions House program to permit her to enroll in the APT Foundation program with home-detention and location monitoring requirements. *Id*. at ¶ 11. Pantano had four positive drug screenings for fentanyl in March 2023, and she ultimately removed her GPS bracelet and absconded from the program on April 11, 2023. *Id*. at ¶ 12. Probation was unable to reach Pantano, and her whereabouts were unknown until May 24, 2023, when state authorities arrested her on six outstanding state warrants. *Id*. at ¶¶ 12, 63.

On August 23, 2023, Pantano entered a plea agreement and agreed not to seek a sentence below 30 months, and the government agreed not to seek a sentence above 41 months. Doc. No. 122.

## II.    <u>Offense Conduct</u>

During the week of July 16, 2022, the FBI and state law enforcement authorities initiated an investigation into the robberies of several People's United Bank locations located inside Stop & Shop grocery stores in Glastonbury, Newington, and West Hartford. PSR ¶ 15. As part of the investigation, law enforcement identified Gino Rizzo as the suspect in robberies in Glastonbury and Newington, through surveillance footage and witness interviews. *Id*. In the third robbery on July 20, 2022 in West Hartford, Rizzo was accompanied by a female, who investigators identified as Pantano. *Id*.

On July 20, 2022, Rizzo and Pantano approached the bank teller counter of the People's United Bank located inside the Stop & Shop at 176 Newington Road, West Hartford, Connecticut. *Id*. at ¶ 18. Rizzo and Pantano each presented different tellers with notes which stated, in sum and substance, "Give us the money with no dye packs or GPS." *Id*. The tellers provided Rizzo and

Pantano with approximately $1,500 in cash, and they left the bank. *Id.*[1] The tellers indicated that no one had been threatened with physical harm or violence, however, one of the tellers who had been approached by Pantano pressed the "hold-up alarm" located underneath her workstation. *Id.* As the defendant points out in her memorandum, "[o]bviously, the teller may have very well assumed that Rizzo and perhaps Pantano had a weapon because of the brazenness of their act." Doc. No. 132 at 4.



A grand jury sitting in Bridgeport, Connecticut returned a three-count indictment for Pantano and Rizzo on August 17, 2022 (with Pantano only charged in Count Three), and federal authorities arrested Pantano on August 30, 2022. Doc. Nos. 1, 22.

### III.   Sentencing Guidelines Calculation

The PSR, filed on October 26, 2023, calculated Pantano's criminal history score as four, which placed her in category III, and calculated her offense level with acceptance of responsibility

---

[1] The government has confirmed with the victim bank, now M&T Bank, that its loss amount from the West Hartford robbery is $1,599.

as 19. PSR ¶¶ 35, 46. Pantano's criminal history score included two "status points" for committing the offense while on state probation, but as the PSR notes, these two "status points" would no longer apply when Part A of Amendment 821 takes effect, PSR ¶ 133, which occurred on November 1, 2023. In light of the Amendment, the government anticipates that probation's recommendation for Pantano's criminal history score is now two, placing her in category II, and an offense level of 19, which results in a guidelines range of 33-41 months.

In the plea agreement, the parties agreed that Pantano's offense level with the acceptance of responsibility is 19. Plea Agreement, Doc. No. 122 at 4. The defendant calculated her criminal history as category I, while the government calculated her criminal history as category II. Under the defendant's calculation, with an offense level of 19 and criminal history category I, her guidelines range is 30-37 months. Under the government's calculation, with an offense level of 19 and criminal history category II, her guidelines range is 33-41 months.

The parties dispute whether Pantano should receive one point under U.S.S.G. § 4A1.2(c)(1) for her conviction for Criminal Mischief in the Second Degree in violation of C.G.S. § 53a-116, for which she received a sentence of six months jail suspended and one year probation, PSR ¶ 43. If the Court counts this prior sentence in Pantano's criminal history score, she would have a total of two points, placing her in category II, whereas if the Court does not count this prior sentence, Pantano would have a total of one point, placing her in category I. The defendant argues that Criminal Mischief in the Second Degree is similar to misdemeanor Disorderly Conduct, Breach of Peace, and Criminal Trespass, which are only counted when the defendant receives a sentence of imprisonment of at least 30 days or a term of probation of more than one year, or if the prior offense was similar to an instant offense. As discussed below, the PSR correctly points out that

Criminal Mischief in the Second Degree is not "similar" to Disorderly Conduct or Breach of Peace in the Second Degree, *see* PSR Addendum; nor is it similar to Criminal Trespass.

"Section 4A1.2(c) of the Sentencing Guidelines provides guidance for determining whether 'prior sentences' are counted in an offender's criminal history score." *See United States v. Valente*, 915 F.3d 916, 921 (2d Cir. 2019). Certain misdemeanor convictions are not counted if they are listed under § 4A1.2(c)(1) or are similar to the listed offenses. *Id.* "In applying Section 4A1.2(c)(1), the goal of the inquiry is to determine whether the unlisted offense under scrutiny is 'categorically more serious' than the Listed Offenses to which it is being compared." *United States v. DeJesus-Concepcion*, 607 F.3d 303, 304 (2d Cir. 2010) (internal quotation marks removed). "Although 'categorically' might be misunderstood to mean that the unlisted offense is within a category that is more serious than the Listed Offenses, [courts] ... use [ ] the adverb in its ordinary sense to mean 'without qualification or reservation.'" *Id.* (internal quotation marks removed).

As the PSR notes, in determining whether an offense is "similar" to a listed offense under §4A1.2(c)(1), the comment (n.12(A)) provides as an example five factors the Court could consider. These include a comparison of the punishments imposed for the listed and unlisted offenses, the perceived seriousness of the offense as indicated by the level of punishment, the elements of the offense, the level of culpability involved, and the degree to which commission of that offense indicates a likelihood of recurring criminal conduct. *See also Valente*, 915 F.3d at 921. The Court applying this standard "should focus on the particular facts of the prior offense whenever the statute that was violated covers a broad range of conduct." *See United States v. Morales*, 239 F.3d 113, 118 (2d Cir. 2000) (explaining how second-degree harassment "can be committed in a variety of ways, and not all the conduct covered by the statute is more serious than the Listed Offenses").

The facts underlying Pantano's conviction for Criminal Mischief in the Second Degree are described in the PSR ¶ 43 and the police report.[2] On September 10, 2019 at 7:42 p.m., officers responded to a report that a female, later identified as Pantano, kicked in the front door of an apartment building and then kicked or punched an apartment door, causing it to swing open. Pantano did not enter the apartment but asked if she could hide in the apartment in exchange for $50. Pantano was sweating profusely, using profanity, and appeared to be on drugs. The resident was scared for her personal safety and for her elderly mother, who was also living in the apartment. The police report indicates that Pantano was confused and presented with a strong smell of alcohol.

As noted in the PSR, under Connecticut law, Criminal Mischief in the Second Degree[3] is a higher class of misdemeanor than Disorderly Conduct[4] and Breach of Peace in the Second

---

[2] Probation recently provided the police report to the parties at the government's request.

[3] A person is guilty of criminal mischief in the second degree when: (1) With intent to cause damage to tangible property of another and having no reasonable ground to believe that such person has a right to do so, such person damages tangible property of another in an amount exceeding two hundred fifty dollars; or (2) with intent to cause an interruption or impairment of service rendered to the public and having no reasonable ground to believe that such person has a right to do so, such person damages or tampers with tangible property of a public utility or mode of public transportation, power or communication, and thereby causes a risk of interruption or impairment of service rendered to the public; or (3) with intent to cause damage to tangible property owned by the state or a municipality that is located on public land and having no reasonable ground to believe that such person has a right to do so, such person damages such tangible property in an amount exceeding two hundred fifty dollars. C.G.S. § 53a-116.

[4] A person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior; or (2) by offensive or disorderly conduct, annoys or interferes with another person; or (3) makes unreasonable noise; or (4) without lawful authority, disturbs any lawful assembly or meeting of persons; or (5) obstructs vehicular or pedestrian traffic; or (6) congregates with other persons in a public place and refuses to comply with a reasonable official request or order to disperse; or (7) commits simple trespass, as provided in section 53a-110a, and observes, in other than a casual or cursory manner, another person (A) without the knowledge or consent of such other person, (B) while such other person is inside a dwelling, as defined in section 53a-100, and not in plain view, and (C) under circumstances where such other person has a reasonable expectation of privacy. C.G.S. § 53a-182.

Degree.[5] Specifically, Criminal Mischief in the Second Degree (C.G.S. § 53a-116) is a class A misdemeanor, while Breach of Peace in the Second Degree (C.G.S. § 53a-181)[6] is a class B misdemeanor and Disorderly Conduct (C.G.S. § 53a-182) is a class C misdemeanor. The maximum punishment for a class A misdemeanor is term of imprisonment up to 364 days, while the maximum punishments for class B and class C misdemeanors are a term of imprisonment up to six months and three months, respectively. *See* C.G.S. §§ 53a-36; 36a. The government submits that, under Connecticut's statutes, Criminal Mischief in the Second Degree is more serious than both of these listed misdemeanors. *See United States v. Gore*, 111 F.3d 124 (2d Cir. 1997) (finding that a conviction under New York's criminal mischief statute, which includes intentional destruction of property and reckless destruction of property with value at least $250, "is generally more serious than disorderly conduct," which does not require a showing of intent, involve the destruction of property, or carry a term of imprisonment); *see also United States v. Ortega*, 94 F.3d 764, 770 (2d Cir. 1996) (finding that "unlawful mischief "[u]nder Vermont law . . . deals with intentional damage to property and carries generally more serious penalties than disorderly conduct . . . which deals with creation of public inconvenience or annoyance") [7]; *but see United*

---

[5] A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; or (3) threatens to commit any crime against another person or such other person's property; or (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person; or (5) in a public place, uses abusive or obscene language or makes an obscene gesture; or (6) creates a public and hazardous or physically offensive condition by any act which such person is not licensed or privileged to do. For purposes of this section, "public place" means any area that is used or held out for use by the public whether owned or operated by public or private interests. C.G.S. § 53a-181.

[6] The appropriate comparison is Breach of Peace in the Second Degree (C.G.S. § 53a-181), rather than Breach of Peace in the First Degree (C.G.S. § 53a-180aa), which is a class D felony.

[7] Both *Gore* and *Ortega* predate the United States Sentencing Commission's adoption of its multifactor "common sense approach" when it amended Application Note 12 to U.S.S.G. § 4A1.2 in 2007, as well as the Second Circuit's case law that required this approach even before

*States v. Reyes-Maya*, 305 F.3d 362, 366 (5th Cir. 2002) (excluding criminal mischief conviction from criminal history score because it was similar to disorderly conduct where the conviction was a class C misdemeanor and only resulted in a $182.50 fine); *United States v. Grob*, 625 F.3d 1209, 1216 (9th Cir. 2010).

The defendant also likens her conviction to Criminal Trespass, which can be a class A misdemeanor (Criminal Trespass in the First Degree, C.G.S. § 53a-107), a class B misdemeanor (Criminal Trespass in the Second Degree, C.G.S. § 53a-108 and Criminal Trespass in the Third Degree C.G.S. § 53a-109(a)(1) & (3)), or a class C misdemeanor (Criminal Trespass in the Third Degree C.G.S. § 53a-109(a)(2)). Although Criminal Trespass in the First Degree[8] is a class A misdemeanor, similar to Criminal Mischief in the Second Degree, Pantano's actual conduct appears more serious than the commission of Criminal Trespass in the First Degree, which would require showing that in individual knowingly entered or remained on a premises without license or privilege to do so after being ordered to leave by the owner or authorized person. As described above, Pantano, while apparently in an intoxicated state, kicked in and damaged the front door of

---

the amendment. *See United States v. Morales*, 239 F.3d 113, 118 (2d Cir. 2000); *United States v. Martinez-Santos*, 184 F.3d 196, 206 (2d Cir. 1999). The government submits, however, that the Second Circuit's analysis is still instructive for this case.

[8] A person is guilty of criminal trespass in the first degree when: (1) Knowing that such person is not licensed or privileged to do so, such person enters or remains in a building or any other premises after an order to leave or not to enter personally communicated to such person by the owner of the premises or other authorized person; or (2) such person enters or remains in a building or any other premises in violation of a restraining order issued pursuant to section 46b-15 or a protective order issued pursuant to section 46b-16a, 46b-38c, 54-1k or 54-82r by the Superior Court; or (3) such person enters or remains in a building or any other premises in violation of a foreign order of protection, as defined in section 46b-15a, that has been issued against such person in a case involving the use, attempted use or threatened use of physical force against another person; or (4) knowing that such person is not licensed or privileged to do so, such person enters or remains on public land after an order to leave or not to enter personally communicated to such person by an authorized official of the state or a municipality, as the case may be.

an apartment building and then kicked or punched open the door to an interior apartment while the residents were home. After forcing the door open, she asked the residents if she could hide in their apartment. The resident reported that Pantano was using profanity and appeared to be on drugs, and her actions caused the resident to fear for her and her elderly mother's safety. Accordingly, the government submits that Pantano's offense was more serious than Criminal Trespass.

The Court may also consider other factors, including the elements of the misdemeanor offenses in determining whether the offenses are similar. A person commits Criminal Mischief in the Second Degree when he/she intentionally damages property in an amount exceeding $250, whereas a person commits Criminal Trespass in the First Degree when he/she knowingly enters or remains at a premises without license or privilege to do so after being ordered to leave by the owner or authorized person. A person commits Criminal Trespass in the Second Degree when, knowing that he/she is not licensed or privileged to do, enters or remains in a building.[9] Although it is unclear from the PSR and police report whether the state could have charged with Pantano with Criminal Trespass in the First Degree because there is no indication whether Pantano entered or remained on the premises after receiving an order to leave or not to enter – a requirement for Criminal Trespass in the First Degree – the elements for both Criminal Trespass statutes are clearly distinguishable from Criminal Mischief in the Second Degree and have no requirement involving the intentional destruction of property. Similarly, as the PSR notes, the elements of Criminal Mischief in the Second Degree are distinguishable from the elements of Breach of Peace in the Second Degree and Disorderly Conduct, which involve causing an inconvenience, annoyance, or alarm.

---

[9] A person is guilty of criminal trespass in the second degree when, knowing that such person is not licensed or privileged to do so, (1) such person enters or remains in a building, or (2) such person enters or remains on public land.

Furthermore, the specific conduct underlying Pantano's conviction for Criminal Mischief in the Second Degree, when viewed along with her history with controlled substances, indicated a likelihood of recurring criminal conduct. The responding officers believed Pantano was under the influence based upon the odor of alcohol and her behavior, and the complainant believed Pantano was on drugs. In light of Pantano's history with controlled substances which included her personal substance abuse and a conviction for conspiracy to commit sale of a narcotic substances from eight months before this incident, this offense indicated a likelihood of recurring criminal conduct.

With regards to Pantano's level of culpability involved in the offense, the government submits that her actions of intentionally damaging property were significant, however, the level of culpability does not appear to be overtly more severe than the listed misdemeanors. Additionally, Pantano's actual punishment for committing Criminal Mischief in the Second Degree – six months jail suspended with one year of probation – exceeds the three-month maximum punishment for Disorderly Conduct but does not exceed the six-month maximum punishment for Breach of Peace in the Second Degree or Criminal Trespass in the First Degree, which is also a class A misdemeanor. However, in consideration of all the factors, the government submits that Pantano's conviction for Criminal Mischief in the Second Degree is not similar to disorderly conduct, breach of peace, or criminal trespassing and should be counted in her criminal history calculation.

IV.    **Discussion**

A court must consider the factors set out at 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); "the need for the sentence imposed" to further the four purposes of sentencing, *id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *id.* § 3553(a)(4); any pertinent policy statement by the Sentencing Commission, *id.* § 3553(a)(5); "the need to avoid

unwarranted sentence disparities," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). The statute directs a court, having considered these factors, to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of federal criminal sentencing:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

*Nature and Circumstances of Offense*

Pantano committed a serious crime when she and Rizzo robbed the People's United Bank. Although the government recognizes that she did not use a firearm, or threaten any violence, the bank employees were undoubtedly fearful during the incident, and one of the tellers who had been approached by Pantano pressed the "hold-up alarm" located underneath her workstation. PSR ¶ 18. An appropriate sentence should reflect the severity of this incident.

*History and Characteristics of the Defendant*

Many of Pantano's problems appear related to her substance abuse. She began using marijuana at age 13. *Id.* at ¶ 86. In 2017 at age 22, she began using and cocaine, and in 2021, she began using crack cocaine and fentanyl. *Id.* at ¶¶ 85, 87, 88. At the height of her fentanyl addiction, she was using 50 bags per day. *Id.* at ¶ 88. Although she indicated that she is remorseful for her conduct, which appears related to her drug use, her actions show a lack of commitment to her recovery. Despite probation's efforts to enroll Pantano in multiple programs, she repeatedly used controlled substances while enrolled in the programs and ultimately removed her GPS monitoring

bracelet and absconded from her program. Without Pantano showing a meaningful commitment to her recovery, the government is concerned that Pantano may continue to reoffend, as evidenced by her long list of pending states charges.

Despite that concern, the government recognizes somewhat mitigating circumstances related to Pantano's childhood. Specifically, she endured a problematic childhood that she attributes to her lacking any relationship with her mother. She reported that her mother's absence motivated her to run away and resulted in her appearing before the Juvenile Court. Despite her mother's absence, she appears to have had a supportive, albeit "strict," family during her childhood and reported that "all her needs were met by her father and her paternal grandparents." *Id*. at ¶¶ 73-78, 141. She reported to probation that she grew up with a father who was "hardworking," "loving," and "independent." *Id*. at ¶ 73. Although Pantano's father would not allow her to see her mother during her childhood, she now understands that her father was protecting her from negative influences. *Id*. She also reported that her paternal grandparents helped raise her, and her grandmother was supportive both financially and emotionally. *Id.* at ¶ 75. Pantano stated that she has a good relationship with her siblings, who remain supportive of her despite their disappointment with her actions. *Id*. at ¶ 74. She also has developed a good relationship with her mother despite her absence during Pantano's childhood. *Id*. at ¶ 73. The government is hopeful that Pantano continues these relationships, which could help her in recovery.

Additionally, Pantano reported that two long-term relationships contributed to her deterioration. Doc. No. 132 at 5; PSR ¶ 94. The PSR also indicates that Pantano suffers from multiple mental health conditions. PSR ¶ 91. The government is sympathetic to both of these mitigating considerations.

*Respect for the Law and Deterrence*

At the time of the bank robbery, Pantano had charges pending for conspiracy to commit larceny 3rd degree, use of drug paraphernalia, interfering with an officer, illegal operation of a motor vehicle under suspension-alcohol, and illegal operation of a motor vehicle under the influence from October 1, 2021, when she was operating a car reported as stolen. PSR ¶¶ 48-49. She also had charges pending for: conspiracy to commit larceny 6th degree and larceny 6th degree from an incident on November 30, 2021; use of drug paraphernalia, interfering with an officer/resisting, and criminal impersonation from an incident on July 7, 2022; larceny 6th degree (two charges) stemming from June 22, 2022; and a failure to appear. *Id.* at ¶¶ 50-55. Pantano was arrested on July 7, 2022 and bonded out of state custody on July 16, 2022. Four days later, she robbed the People's United Bank in West Hartford. Following the robbery, but prior to her federal arrest, Pantano was arrested again for use of drug paraphernalia, interfering with an officer/resisting, and criminal impersonation for an incident on July 29, 2022. *Id.* at ¶ 57. Furthermore, after absconding from her program on April 11, 2023, Pantano was arrested on May 24, 2023 for use of drug paraphernalia, interfering with an officer/resisting, and criminal impersonation for an incident that occurred on April 25, 2023. In light of these arrests and that fact that she returned to committing criminal activities as soon as she bonded out of state custody, Pantano has demonstrated that she is undeterred from committing criminal conduct. As discussed above, however, it appears that much of this criminal activity was linked to her drug dependency.

V.   **Conclusion**

The government respectfully submits that the Court impose a sentence of 33 months, which is at the bottom of the Guidelines range, as sufficient but not greater than necessary to accomplish the various goals of sentencing.

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

_/S/_____
ROBERT S. DEARINGTON
ASSISTANT U.S. ATTORNEY
Federal Bar No. ct28862
robert.dearington@usdoj.gov
450 Main Street, Suite 328
Hartford, CT 06103
Tel: 860-760-7981

## CERTIFICATE OF SERVICE

This is to certify that on November 28, 2023, a copy of the foregoing Government's Memorandum was filed electronically and served by first-class United States mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

___/s/_____
ROBERT S. DEARINGTON
ASSISTANT U.S. ATTORNEY